# In the United States Court of Federal Claims

No. 12-431L

(Filed: July 16, 2013)

```
*****************************************
                                        *
GRACE M. GOODEAGLE, et al.,             *
                                        *
                                        *
                  Plaintiffs,           *
                                        *
 v.                                     *
                                        *
THE UNITED STATES,                      *
                                        *
                  Defendant.            *
                                        *
*****************************************
```

Indian Tribe Claims for Tribal Trust Fund Mismanagement; Rule 12(b)(1) and (b)(6) Motion to Dismiss; Fiduciary Duties to Indian Tribes; 28 U.S.C. § 2501; Statute of Limitations; Effect of Appropriations Act Riders.

*Nancie G. Marzulla,* with whom were *Roger J. Marzulla,* Marzulla Law, LLC, Washington, D.C., *Stephen R. Ward* and *John L. Williams*, Conner & Winters, LLP, Tulsa, Oklahoma, Of Counsel, for Plaintiffs.

*Stephen R. Terrell,* Trial Attorney, with whom were *Ignacia S. Moreno,* Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., *Shani Walker* and *Joshua Edelstein,* Office of the Solicitor, U.S. Department of Interior, *Thomas Kearns* and *Rebecca Saltiel*, Office of the Chief Counsel, Financial Management Service, U.S. Department of the Treasury, Of Counsel, for Defendant.

## OPINION AND ORDER ON
## DEFENDANT'S MOTION TO DISMISS

WHEELER, Judge.

Plaintiffs in this case are Grace M. Goodeagle, Thomas Charles Bear, Edwina Faye Busby, Phyllis Romick Kerrick, Jean Ann Lambert, Florence Whitecrow Mathews, Ardina Revard Moore, Tamara Anne Romick Parker, and Fran Wood, all of whom are enrolled members of the Quapaw Tribe of Oklahoma.[1]  Plaintiffs commenced this action

---

[1]  "Quapaw" is an anglicized word for the "O-Gah-Pah" Indian nation, which means "the people who went downstream" or "the Downstream People."  Compl. ¶ 12.

on June 28, 2012 by filing a complaint for money damages arising from Defendant's alleged breach of fiduciary and trust obligations owed to the Quapaw Tribe and its members.  The complaint contains eight causes of action.

On August 27, 2012, Defendant filed a motion for partial dismissal of the complaint, asserting that the Court lacks subject matter jurisdiction or that Plaintiffs had failed to state claims upon which relief can be granted.  In the alternative, Defendant requested that the Court order Plaintiffs to file a more definite statement of their claims. Defendant limited its motion to the third, fifth, sixth, and eighth causes of action, and did not challenge the first, second, fourth, and seventh causes of action.  Plaintiffs filed an opposition to Defendant's motion on November 26, 2012, and Defendant filed a reply on December 23, 2012.  The Court heard oral argument on June 4, 2013.[2]

For the reasons explained below, Plaintiffs' complaint generally meets the notice pleading requirements of Rule 8 of the Court of Federal Claims ("RCFC") to show "a short and plain statement" of the basis for jurisdiction and Plaintiffs' claims, as well as a demand for the relief sought.  Thus, the Court denies Defendant's request for Plaintiffs to file a more definite statement of their claims as to the third cause of action.  The Court grants Defendant's motion to the extent the third cause of action is meant to apply to more than losses under actual leases.  That cause of action is not timely as to "hypothetical leases" where town lots might have been leased but were not.  The Court grants Defendant's motion to dismiss Plaintiffs' fifth cause of action, as the consequential harm to Plaintiffs' land from the mining activities does not constitute a continuing trespass, and therefore the claim is untimely.  Similarly, Plaintiffs' sixth cause of action alleges mismanagement of trust assets, and also is untimely.  Finally, the Court finds that Plaintiffs' eighth cause of action is not ripe for adjudication, and therefore dismisses it without prejudice.

I.      Factual and Procedural History

This case has a lengthy history.  A summary of Plaintiffs' allegations provides a useful background to the issues presented in Defendant's motion.

According to the complaint, the Quapaw Tribe's homeland for many centuries was near the confluence of the Mississippi and Arkansas Rivers in the eastern and south-central portions of the present-day State of Arkansas. Compl. ¶ 12.  When Europeans first encountered the Quapaw in the 1670s, approximately 15,000 to 20,000 Quapaw

---

[2] Judge George W. Miller originally was assigned to this case.  By mutual agreement, due to the previous assignment of two related cases to Judge Thomas C. Wheeler, Judge Miller transferred this case to Judge Wheeler on April 2, 2013.  The related cases are Quapaw Tribe of Oklahoma v. United States, No. 12-592L, and Thomas Charles Bear et al. v. United States, No. 13-51X, a congressional reference case.

lived in villages in this region.  Id.  Historically, the Quapaw engaged in agricultural endeavors, and the focus of their lives was on the farming villages.  Id.

In 1818, under pressure from white settlements and a territorial government, the Quapaw Tribe signed a treaty ceding most of their land in Arkansas to the United States. Id. at ¶ 13.  The ceded land included the hot springs area which today is Hot Springs National Park.  Id.  In 1824, the United States forced the Quapaw to cede the remainder of its land in Arkansas, and moved them to an area in northeastern Louisiana on the south side of the Red River.  Id.  The Quapaw were unwelcome in Louisiana, their lands flooded, and starvation was rampant.  Id. at ¶ 14.  The Quapaw became a homeless nation, and many of the people returned to their former homeland in Arkansas.  Id.

Later, the United States again moved the Quapaw Tribe, this time to a more northern location along the present-day border between Oklahoma and Kansas.  Id. at ¶ 15.  Under a May 13, 1833 treaty, the United States established a reservation for the Quapaw, consisting of 150 sections of land west of the Missouri state line, between the lands of the Seneca and Shawnee Tribes.  Id.  According to the treaty, the United States promised this land to the Quapaw Tribe as a homeland for "as long as they shall exist as a nation or continue to reside thereon."  Id. (citing treaty).  After boundary adjustments following the Civil War, the present-day Quapaw reservation consists of approximately 92 square miles.  Id. at ¶ 17.

By enactment of the Quapaw National Council on March 23, 1893, the Quapaw Tribe self-allotted all the Tribal land within the reservation in present-day Oklahoma to individual members of the Tribe.  Id. at ¶ 18.  The Tribe carried out the allotments in two phases.  The first phase consisted of 200-acre tracts allotted in the fall of 1893, and the second phase consisted of 40-acre tracts allotted in the spring of 1894.  Id.  Congress ratified all of the Tribe's allotment determinations in 1895.  Id.  Each of the Plaintiffs is a successor-in-interest to one or more of these original allotments.  Id.  Plaintiffs allege that the United States has or should have managed the allotments for their use and benefit since the approval of the allotments.  Id.

Meanwhile, rich lead and zinc deposits were discovered on Quapaw lands in the late 1800s, resulting in a rush to lease these lands.  Id. at ¶ 28.  Based upon the allotment process and responsibilities, the federal government exercised control over the leasing of Quapaw lands.  Id.  After mining activities began, the Bureau of Indian Affairs ("BIA") recommended that the federal government consolidate control over Quapaw lands.  Id. In 1921, Congress passed a statute granting complete federal authority over leasing of mineral interests for a specific set of named Quapaw allottees and their heirs.  Id. Plaintiffs state that, during the many decades of extensive mining on Quapaw Tribal members' allotted land, all mining and property was under the direct and exclusive supervision and control of the United States.  Id.

The lead and zinc mining operations on the Quapaw lands produced a by-product of mine tailings known as "chat." Id. at ¶ 29. This by-product has value as a commodity used in road and other construction activities, but it also is an environmental hazard. Id. Plaintiffs state that the mill sites and the accumulation of chat on the Quapaw lands has contaminated the soil and ground water and destroyed the value of the land for agricultural or any other use. Id. at ¶ 42. Further, Plaintiffs allege that the Quapaw Tribal members have not been paid fair market value for the chat by-product, and that large quantities of chat have been stolen or illegally sold. Id. at ¶¶ 29, 30. According to Plaintiffs, title to Quapaw assets (including chat) have been sold to non-Indian owners contrary to law, and without compensation to the Quapaw. Id. at ¶ 30.

With the beginning of lead and zinc mining in the early 1900s, the mining town of Picher, Oklahoma developed largely on the Quapaw reservation. Picher was incorporated in 1918, and by 1920, Picher's population was 9,726. Id. at ¶ 40. Picher's peak population of 14,252 occurred in 1926, but then followed a gradual decline to 2,553 in 1960 as mining activity decreased. Plaintiffs state that the Picher area produced over $20 billion in ore between 1917 and 1947. Id. More than 50 percent of the lead and zinc used during World War I was produced by the Picher district. Id.

Much of the Quapaw Tribal allotment lands were rich and highly productive farmland. Id. at ¶ 46. The Quapaw historically had grown a wide variety of crops on their lands. Id. They also had a large supply of timber, and grazing land for cattle. Id. Ottawa County, where the Quapaw lands are located, once was known as the Hay Capital of the World. Id. Plaintiffs allege that, today, much of the productive farm and grazing land "is a virtual moonscape that the [Environmental Protection Agency] has designated as the Tar Creek Superfund site, one of the nation's worst environmental disasters." Id. at ¶ 47. According to Plaintiffs, the United States allowed the mining companies to pile hundreds of millions of tons of toxic mining wastes on the land, creating toxic millponds, polluting Tar Creek and other surface and ground waters with lead, zinc and cadmium. Id. Plaintiffs characterize Picher and its surroundings as "an abandoned, worthless ghost town." Id.

In 2002, the Tribe commenced legal action in the U.S. District Court for the Northern District of Oklahoma in a case captioned Quapaw Tribe of Oklahoma (O-Gah-Pah) v. U.S. Department of the Interior, No. 02-CV-129-H(M) (N.D. Okla.). The Quapaw Tribe requested an accounting of the historical federal management of the Tribe's trust assets. On November 5, 2004, the Quapaw Tribe entered into a settlement agreement with the United States whereby the parties agreed that Quapaw Information Systems, Inc., a not-for-profit Tribal entity, would prepare an analysis of the Government's management of Tribal assets ("the Quapaw Analysis"). Compl. ¶ 19. The Tribe agreed to dismiss its lawsuit and to waive any rights to an accounting of its trust

assets up to and including the date of the settlement agreement.  Id.  Upon completion of the Quapaw Analysis, the Tribe would be deemed to have been furnished with an accounting of the Tribe's trust assets.  Id.  In entering into this settlement agreement, the Quapaw Tribe reserved all claims for money damages arising from past events and transactions.  The settlement did not purport to compromise or waive the claims of any tribe member for money damages.  Id. at ¶ 20.

Between 2004 and 2010, Quapaw Information Systems investigated and prepared the Quapaw Analysis.  Id. at ¶ 21.  The team performing this review undertook a comprehensive examination of files and documents made available by the Office of Historic Trust Accounting and other agencies to determine whether and to what extent the Department of Interior met its fiduciary obligations to the Tribe and individual trust beneficiaries.  Id.  On June 1, 2010, Quapaw Information Systems completed the Quapaw Analysis Report and transmitted it to the Government.  Id. at ¶ 22.  On November 19, 2010, the Department of Interior accepted the report as complete.  Id.  Plaintiffs state that the Quapaw Analysis identified many pervasive breaches of the Government's fiduciary duty to the Quapaw Tribe and its members.  Id. at ¶ 23.

Plaintiffs' June 28, 2012 complaint in this Court contains eight causes of action against the United States as follows:  (1) failure to collect rents/royalties for mineral rights and to properly manage those assets; (2) failure to protect Tribal Members' mineral interests; (3) failure to collect rents/payments for town lots; (4) mismanagement of agricultural leases and rents; (5) failure to protect natural resources and failure to protect the environment; (6) failure to protect Quapaw Tribal Members and otherwise act in their best interests; (7) failure to manage Individual Indian Money ("IIM") accounts; and (8) an alternative claim for failure to pay just compensation for property taken.  Compl. ¶¶ 28-75.

In its motion for partial dismissal, Defendant contends that Plaintiffs' third and fifth causes of action are untimely because they are barred by the six-year statute of limitations, 28 U.S.C. § 2501.  Defendant also maintains that the fifth cause of action is preempted by the Comprehensive Environmental Response, Contamination, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(h), and that the sixth cause of action is outside the Court's subject matter jurisdiction because sovereign immunity has not been waived.  Finally, Defendant asserts that the third, fifth, sixth, and eighth causes of action fail to state claims upon which relief can be granted.  For the third cause of action, Defendant requests the Court to require Plaintiffs to file a more definite statement of their claims.  For the eighth cause of action, Defendant argues that the claim is not yet ripe for adjudication.  Having been fully briefed and argued, Defendant's motion is ready for decision.

II.     Standard of Review

        Jurisdiction is a threshold matter which must be established "before the court may proceed with the merits."  Overview Books, LLC v. United States, 72 Fed. Cl. 37, 40 (2006) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998)).  When ruling on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the court must accept all undisputed factual allegations as true and draw all reasonable inferences in favor of the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  The burden lies with the plaintiff to establish jurisdiction through a preponderance of evidence.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

        Under Rule 12(b)(6), a plaintiff is only required to offer "'a short and plain statement,'" showing a plausible claim to relief to survive a motion to dismiss.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  In deciding whether a party is required to file a more definite statement of fact under Rule 12(e), "the trial judge has full authority, in his discretion, to order a more definite statement[.]"  Johns-Manville Corp. v. United States, 12 Cl. Ct. 1, 16 (1987) (citation omitted).

III.    Discussion

        a.  Plaintiffs' Third Cause of Action

        Defendant contends that Plaintiffs' third cause of action for recovery of rents and other payments for town lots is barred by the statute of limitations.  Def's Mot. 6-10.  The third cause of action mainly refers to actual leases under which Plaintiffs have not received amounts due them, either as rent or other payments such as bonds forfeited for environmental damage.  The recited trust obligations that Plaintiffs say were breached, Compl. ¶ 44, all relate to obligations under actual leases, or the failure to recover possession from trespassers.  One paragraph of the complaint, ¶ 41, refers to "areas [that] have been unleasable since the early 1900s," due to the existence of chat on town lots.  This paragraph presumably refers to town lots that could have been leased but were not, thus encompassing hypothetical leases rather than actual leases.  The complaint also contains allegations regarding tenants who "obtained permits on several lots from the Agency [BIA] and then subleased the restricted lots to other renters, pocketing the rent."  Id. at ¶ 42.

        The parties agree that, under the various Department of Interior Appropriations Act riders issued each year from 1990 to the present, claims for losses due to mismanagement of trust funds do not accrue until the affected tribe or individual Indian has been furnished with an accounting.  See, e.g., Consolidated Appropriations Act,

6

2012, Pub. L. No. 112-74, 125 Stat. 786, 1002 ("the Appropriations Act"). Thus, even though the operative facts here began occurring in the early 1900s, the Appropriations Act language, "notwithstanding any other provision of law," displaces the usual six-year statute of limitations in 28 U.S.C. § 2501 until an accounting is received. See Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1346 (Fed. Cir. 2004) ("Shoshone II") (citing Marcello v. Bonds, 349 U.S. 302, 310-11 (1955)). In this case, the Department of Interior accepted the Quapaw Analysis as a final accounting on November 19, 2010. This is the date the statute of limitations began to run.

The Appropriations Act riders displace 28 U.S.C. § 2501 as to claims "concerning losses to or mismanagement of trust funds." The disputed issue here is which of Plaintiffs' claims relate to "trust funds." Relevant case law establishes that the Appropriations Act language applies to "trust funds," but not to "trust assets." Shoshone II, 364 F.3d at 1350. As the Federal Circuit has explained, the Appropriations Act language displaces 28 U.S.C. § 2501 in those circumstances where a "final accounting" is necessary to put the tribe on notice that a breach of a fiduciary obligation has occurred. San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1355 (Fed. Cir. 2011).

As applied to this case, a "final accounting" logically would be necessary to address trust fund losses on actual leases. However, a "final accounting" would not be necessary for hypothetical leases that were never executed. Thus, the Court concludes that Plaintiffs' third cause of action is timely as to allegations relating to actual leases, but is not timely as to hypothetical leases. If Plaintiffs' third cause of action is intended to seek damages for town lots that could have been leased but were not, those allegations are untimely. Plaintiffs' claims are confined to those that exist under actual leases. The identification of those individual leases may be determined during discovery.

To the extent Plaintiffs have asserted timely claims in their third cause of action, Defendant requests that the Court grant its motion to compel Plaintiffs to file a more definite statement as to those claims. Rule 8(a) establishes the standards for a sufficiently pled claim: "plaintiffs must only include in their pleading '(1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment of the relief the pleader seeks.'" Fed. Air Marshals v. United States, 74 Fed. Cl. 484, 488 (2006) (quoting RCFC 8(a)). According to Rule 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." RCFC 12(e). Essentially, "[t]he rule 'is designed to remedy unintelligible pleadings, not to correct for lack of detail.'" Kuklachev v. Gelfman, 600 F. Supp. 2d 437, 456 (E.D.N.Y. 2009) (quoting Dunlop-McCullen v. Local 1-S RWDSU-AFL-CIO, 1994 WL 478495, at *1 (S.D.N.Y. Sept. 1, 1994)).

Defendant argues that it "has insufficient knowledge of exactly what plaintiffs believe the United States did wrong." Def.'s Reply 4. Under Rule 8, "a short and plain statement of the claim showing that the pleader is entitled to relief" satisfies the notice pleading requirements. Defendant has in its possession both the Quapaw Analysis and the "database in which up to half-a-million documents were collected and analyzed" to create the Quapaw Analysis. Opp'n 18. Accordingly, Defendant's argument that it has "insufficient knowledge" concerning the actual leases in Plaintiffs' third claim fails to persuade the Court that a more definite statement is appropriate. See Fed. Air Marshals, 74 Fed. Cl. at 488 ("[c]onsidering defendant has control over the[] records itself, it can easily access those documents during discovery . . . [t]herefore the court denies defendant's Motion for a More Definite Statement."). In this instance, Plaintiffs' allegations relating to the actual leases identified in their third claim meet the notice pleading requirement of Rule 8. Plaintiffs' claims establish a basis for relief and are sufficiently intelligible and detailed.

### b. Plaintiffs' Fifth Cause of Action

In their fifth cause of action, Plaintiffs allege that the Secretary of the Interior failed to protect the environment of the tribal land and its natural resources, in breach of trust agreements. Plaintiffs allege that the United States failed to properly monitor leases on the land, thus allowing for significant land contamination. Furthermore, Plaintiffs argue that the United States failed to address the contamination, which "deprived [them] of substantial sums of rent and other amounts that they would have received from their land had it not been contaminated and destroyed[.]" Compl. ¶ 56. Defendant argues that Plaintiffs' fifth cause of action is preempted by CERCLA, which prevents any challenge to Environmental Protection Agency ("EPA") cleanup efforts prior to completion. Def.'s Mot. 12-16. Alternatively, the Government argues that Plaintiffs' claims occurred decades before the filing of their complaint, and the tolling provisions of the Appropriations Act do not apply. Id. at 16-17. The parties agree that Plaintiffs' fifth cause of action is one of trust asset mismanagement. Def.'s Reply 5-6; Opp'n 26.

### i. CERCLA Limits

Plaintiffs' allotted trust land is located within the Tar Creek Superfund Site. Def.'s Mot. 12. The Tar Creek Superfund Site was placed on the National Priorities List on September 8, 1983. Id. Thereafter, the EPA began its environmental remediation efforts, monitoring water quality, residential property contamination, and chat piles. Id. The EPA's cleanup efforts are currently underway, and are expected to continue for many years. Id. Section 113(h) of CERCLA provides that "[n]o Federal court shall have jurisdiction . . . to review any challenges to removal or remedial action selected under [CERCLA]." 42 U.S.C. § 9613(h). This provision "protects the execution of a CERCLA plan during its pendency from lawsuits that might interfere with the expeditious cleanup

8

effort."  McClellan Ecological Seepage Situation v. Perry, 47 F.3d 325, 329 (9th Cir. 1995).

Although Defendant characterizes Plaintiffs' fifth cause of action as an attack on the CERCLA remedy for the Tar Creek Superfund Site, Def.'s Mot. 14, the actual language of count five belies this description.  In their complaint, Plaintiffs contend that the Secretary of the Interior failed to "[a]ppropriately manag[e] the natural resources located within the boundaries of Indian reservations and trust lands" in violation of its fiduciary duties and trust obligations, and also failed "to supervise operations so as to maintain safety and efficiency, health and sanitation, and prevention of material or economic waste."  Compl. ¶¶ 52, 54.  The crux of Plaintiffs' fifth cause of action is the underlying harm that led to the current environmental devastation of the land – the acts and omissions of the United States in violation of the fiduciary duties and trust obligations owed to Plaintiffs.  Nowhere in Plaintiffs' fifth cause of action does the Court discern any challenge to the EPA's current remedial efforts, see id. at ¶¶ 52-56, and indeed, Plaintiffs expressly deny such a claim, Opp'n 21.  Given that Plaintiffs' fifth cause of action does not challenge the EPA's removal or remedial measures, the Court finds that this claim will not "interfere with the expeditious cleanup effort."  McClellan, 47 F.3d at 329.  Rather, Plaintiffs' claim rests on the Government's breaches of duties and obligations that made the EPA cleanup necessary.  Accordingly, Plaintiffs' fifth cause of action is not preempted by CERCLA.

ii.    Continuing Trespass Theory

Defendant further argues that despite section 113(h) of CERCLA, Plaintiffs' claims are barred by the applicable statute of limitations.  Plaintiffs allege that beginning at the turn of the last century the Government breached its duty to manage the land's natural resources appropriately:

> [F]rom the time Defendant initially leased the lands . . . to mining companies in the early part of the twentieth century, through the mining boom of World War I and World War II, and continuing through the mine closures at mid-century and subsequent efforts to clean up the environmental devastation left behind.

Compl. ¶ 54.  This environmental devastation led to the classification of the Quapaw Reservation as a Superfund site in 1983.  Plaintiffs first filed suit to address the contamination of tribal lands on December 10, 2003.  Defendant argues that because (1) this is a trust mismanagement claim, and (2) the environmental harm for which Plaintiffs seek compensation occurred more than six years prior to the filing of their complaint, the tolling provisions of the Appropriations Act riders do not apply, and therefore Plaintiffs'

claims are barred by the statute of limitations. Plaintiffs counter that the mining waste, toxic dust, and air pollution constitute a continuing trespass on their land, and as such, their claim is timely. Plaintiffs' argument is based on the Government's fiduciary duty to "[a]ppropriately manag[e] the natural resources located within the boundaries of Indian reservations and trust lands." 25 U.S.C. § 162a(d)(8). Plaintiffs contend that "the environmental devastation caused by mining operations that occurred under the supervision of the Secretary of Interior" resulted from the Government's failure to comply with its statutory duty. Opp'n 21. To that end, Plaintiffs allege that the "mountains of mining waste, toxic dust, and air pollution" constitute a trespass, which the Government has a continuing duty to remove. Id. at 27.

In Shoshone IV, the plaintiff-tribe brought a claim for mismanagement of trust assets arising from the extraction of oil and gas from their land parcels. Shoshone Indian Tribe of Wind River Reservation v. United States, 672 F.3d 1021, 1039 (Fed. Cir. 2012) ("Shoshone IV"). Although the claim fell outside the scope of the Appropriations Act's tolling provision, the plaintiff-tribe argued that the leases under which the companies extracted oil were void. Id. at 1034-35. Therefore, the plaintiff-tribe argued, the oil companies were continuing trespassers, with each extraction creating its own action and six-year statute of limitations. Id. at 1035. The Federal Circuit found the leases void for failure to comply with a treaty provision requiring a competitive bidding process, and consequently, held that the purported lessees were in fact trespassers. Id. at 1038. To state a viable claim, however, the plaintiff-tribe had to establish that the Government had a duty to eject the trespassers from their land. Id. at 1039-40. Because of the lower court's "incorrect conclusion that no continuing trespass had been asserted as a matter of law," the Federal Circuit remanded the case for argument on whether any relevant statute or regulation created a duty to remove trespassers. Id. at 1041. In this case, unlike in Shoshone IV, Plaintiffs do not argue that the leases to the mining companies were invalid conveyances. Although the failure to manage and supervise the mining operations on the land may have given rise to claims against the Government for breach of its fiduciary duties, there is no trespass here.

The Government had a duty to protect the environment and manage the natural resources on the Quapaw land. The duty to manage and supervise the mining operations arguably arose each day mining activity occurred on the land, with each failure to fulfill that duty giving rise to a separate claim. See Mitchell v. United States, 10 Cl. Ct. 63, 77 (1986) ("A duty to replant each [tree] arguably arose after its harvest and each failure to fulfill that duty gave rise to a separate claim."). Nevertheless, "each such claim arose only once," and the six-year statute of limitations began to run from the time the duty was breached. Id. Mining operations on Plaintiffs' land, and implicitly, the duty to monitor those operations, have long since ceased. Plaintiffs do not, and cannot, allege that the Government breached its fiduciary duty to manage the natural resources or supervise

mining operations on their land during the six-year period preceding the filing of their suit.

The presence of mining waste, toxic dust, and air pollution on Plaintiffs' land is the cumulative effect of the Government's alleged failure to properly manage the land's natural resources and supervise the mining activities thereon. "That failure, and the consequential damages resulting from it, constitute[s] the actionable wrong that [Plaintiffs] seek to vindicate." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1457 (Fed. Cir. 1997). Because Plaintiffs seek damages "for the cumulative effect of alleged breaches by the Government that were outside of the six-year statute of limitations period, [Plaintiffs'] suit d[oes] not represent a continuing claim." Shoshone IV, 672 F.3d at 1035 n.9 (citing Brown Park, 127 F.3d at 1457-58). Thus, Plaintiffs' fifth cause of action is barred by the statute of limitations.

c.  Plaintiffs' Sixth Cause of Action

In their sixth cause of action, Plaintiffs allege that the United States violated its fiduciary duties by failing to protect Quapaw Tribal members and to otherwise act in their best interest. The Government moves to dismiss, arguing that claims for breach of a general trust relationship against the United States are insufficient to establish jurisdiction under the Tucker Act or the Indian Tucker Act.

In their opposition, Plaintiffs cite various statutory and regulatory provisions to support the claim that the Government failed "to protect Quapaw Tribal Members and otherwise to act in their best interests." Compl. ¶ 57. In their sixth cause of action, Plaintiffs set forth various alleged breaches of legal duties "concerning the individual Quapaw Tribal members' assets[,]" such as allowing restricted Quapaw property to be sold or stolen, failing to properly manage commingled restricted Indian and fee lands, and artificially suppressing values of rentals and sales of restricted Indian property. Id. at ¶ 58. The Court fails to perceive how this claim alleges mismanagement of funds when Plaintiffs' fifth claim that the Government failed "to protect natural resources and fail[ed] to protect the environment" alleges mismanagement of assets. Id. at ¶ 52.

The Federal Circuit repeatedly has held that "claims related to trust funds involve losses 'resulting from the Government's failure to timely collect amounts due and owing to the Tribes' under relevant contracts, while claims related to trust assets involve losses resulting from the terms of a contract being suboptimal." Shoshone IV, 672 F.3d at 1034-35 (quoting Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1350-51 (Fed. Cir. 2004)). As stated above, the tolling provisions of the Appropriations Act riders only apply to claims for mismanagement of trust funds. Therefore, to the extent that Plaintiffs' sixth cause of action is a claim for mismanagement of trust assets, it is barred by the statute of limitations.

   d.  Plaintiffs' Eighth Cause of Action

As their eighth and final cause of action, Plaintiffs bring an alternative takings claim, alleging that they were deprived of their property interest in their legal claims by virtue of both a judicial taking through the Cobell settlement and a legislative taking through the Claims Resolution Act of 2010.  Plaintiffs emphasize that they include this claim "only to the extent Plaintiffs are precluded from recovery on any of their claims set forth in the first through seventh causes of action."  Compl. ¶ 63.  The Government moves to dismiss this claim for various reasons, including the speculative viability of a judicial takings claim, the lack of a property right in legal claims, and lack of ripeness.

At oral argument, counsel for Plaintiffs described the eighth cause of action as follows: "if as a result of the congressional action in approving th[e] [Cobell] settlement it simultaneously permanently wiped out any of the claims of these Plaintiffs, that would be a taking.  That issue is not before the Court at this moment[.]"  Tr. 65 (R. Marzulla).  The Court agrees with the Government that Plaintiffs' eighth cause of action is premature.  Accordingly, the Court dismisses this count without prejudice, though it may be reasserted at a later date should it become ripe for adjudication.

   IV.   Conclusion

For the reasons set forth above, the Government's motion for partial dismissal of Plaintiffs' claims is GRANTED in part and DENIED in part.  Pursuant to Rule 12(a)(4), the Government shall file its answer within fourteen days of this opinion, on or before July 30, 2013.

   IT IS SO ORDERED.

                              s/ Thomas C. Wheeler
                              THOMAS C. WHEELER
                              Judge