# In the United States Court of Federal Claims

Nos. 12-431L, 12-592L, 13-51X

(Filed: September 12, 2016)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
GRACE M. GOODEAGLE, *et al.*,          \*
                Plaintiffs,          \*
  v.          \*
                         \*
THE UNITED STATES,          \*
                Defendant.          \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
QUAPAW TRIBE OF OKLAHOMA,          \*
                Plaintiff,          \*
  v.          \*
                         \*
THE UNITED STATES,          \*
                Defendant.          \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
THOMAS CHARLES BEAR, *et al.*,          \*
                Claimants,          \*
  v.          \*
                         \*
THE UNITED STATES,          \*
                Defendant.          \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Indian Tribe Claims; Breach of Trust Obligations; Partial Summary Judgment; Law of the Case; Binding Effect of Government-Sponsored Accounting Reports; Establishing Government Duties to Tribes; Congressional Reference; Statute of Limitations in Tribal Claims; Res Judicata.

*Nancie G. Marzulla,* with whom were *Roger J. Marzulla,* Marzulla Law, LLC, Washington, D.C., *Stephen R. Ward* and *John L. Williams,* Conner & Winters, LLP, Tulsa, Oklahoma, Of Counsel, for Plaintiff.

*Brian M. Collins,* with whom were *John C. Cruden,* Assistant Attorney General, and *Peter K. Dykema*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., *Kenneth Dalton, Shani N. Walker,* and *Karen Boyd,* U.S. Department of Interior, *Thomas Kearns* and *Rebecca Saltiel*, U.S. Department of the Treasury, Of Counsel, for Defendant.

OPINION AND ORDER ON
CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

WHEELER, Judge.

This case involves many significant claims against the United States for breaches of fiduciary duty, among other things. Both parties assert that multiple claims can be resolved through summary judgment. The Quapaw Tribe relies heavily on the claim that an accounting document known as the Quapaw Analysis is binding upon the Government, and thus asserts that its claims grounded on this document should be granted through summary judgment. The Government disputes the binding authority of the Quapaw Analysis entirely and asserts multiple defects in the Quapaw Tribe's claims that bar it from recovery. As explained below, the Court finds that the Quapaw Analysis is binding as to its factual findings only, but not as to the valuation, extrapolation, and calculation models it contains to calculate damages. In addition, the Court finds no merit in any of the arguments for summary judgment presented by the Government. For these reasons, Plaintiffs' motion for partial summary judgment regarding the Quapaw Analysis is GRANTED IN PART, but in all other respects, the parties' cross-motions for summary judgment are DENIED.

Factual and Procedural Background

Due to the breadth of issues involved in the Plaintiffs' and Defendant's cross-motions for partial summary judgment and the importance of the Quapaw Analysis for these cross-motions, it is first necessary to describe the background of the Quapaw Analysis and the case up to this point.

Following the discovery of valuable minerals on Quapaw lands in the 19th century, the federal government began exercising control over the leasing of Quapaw lands. Goodeagle v. United States, 111 Fed. Cl. 716, 719 (2013). In 1921, Congress passed a statute granting complete federal authority over mineral leasing of specific allotments of Quapaw land. Id. Subsequently, the federal government controlled a significant portion of Quapaw land. Quapaw Tribe of Oklahoma v. United States, 111 Fed. Cl. 725, 728 (2003). This case arises out of the alleged federal mismanagement of these Quapaw lands resulting in a breach of trust.

In 2002, the Quapaw Tribe commenced legal action in the U.S. District Court for the Northern District of Oklahoma during which the Quapaw Tribe requested an accounting of the federal management of the Tribe's trust assets in accordance with the Consolidated Appropriations Act of 2012. Id. (citing Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786 (2011)). In 2004, the Quapaw Tribe entered into

a settlement agreement with the United States whereby the parties agreed that Quapaw Information Systems, Inc. ("QIS"), a not-for-profit Tribal entity, would prepare an analysis of the Government's management of Tribal assets ("the Quapaw Analysis") and, as a result, the Tribe agreed to dismiss its lawsuit.  Id. at 729.

Importantly, upon completion of the Quapaw Analysis, the Tribe would be deemed to have been furnished with an accounting of the Tribe's trust assets under the meaning of the Consolidated Appropriations Act.  Def.'s Resp. Ex. 1, Settlement Agreement art I, § 4 (hereafter "Settlement").  In conjunction with the Quapaw Analysis satisfying the statutory requirement for an accounting, "[t]he Tribe agrees to *waive any rights* it has to obtain from the United States an accounting of its [Tribal Trust Fund Accounts] and any of its other trust assets, and for an asset management history of its trust assets for all time periods up to and including the effective date of this Settlement Agreement…" Id.  Pursuant to the Settlement, any claim for an asset history management of the Tribe's trust assets under the Consolidated Appropriations Act of 2012 was dismissed with prejudice.  Id.

Between 2004 and 2010, QIS investigated and prepared the Quapaw Analysis. The team performing this review undertook a comprehensive examination of files and documents made available by the Office of Historic Trust Accounting ("OHTA") and other agencies to determine whether the Department of Interior met its fiduciary obligations to the Tribe and individual trust beneficiaries.  Quapaw, 111 Fed. Cl. at 729.  Throughout the preparation of the Quapaw Analysis, the government actively oversaw and reviewed the documents prepared by QIS.  The QIS contract provided for specific government oversight. Def.'s Resp. Ex. 1, QIS Contract § C.1 (f) (hereafter "Contract").  QIS was required to produce the "Quapaw Analysis Methodology Briefing", the "Quapaw Analysis Preliminary Factual Findings Report", the "Draft Quapaw Analysis", and the "Quapaw Analysis" and submit each to the Department of Interior. Id. at C.1 (f) (1) (a-b).  QIS would then hold a "work session" with Interior personnel to discuss the documents.  Id. at C.1 (f) (1) (c).  Finally, OHTA would determine whether or not additional information was needed based partially upon "the extent to which the Document Collection Plan supports the Quapaw Analysis Methodology Briefing." Id. at C.1 (f) (2) (d) & (h) (2) (b).  OHTA provided comments and criticisms on the Quapaw Analysis and determined that it was "an acceptable final deliverable." Pls.' Mot. for Partial Summ. J., Ex. 2, Estes Dep. Tr. at 64:10-16.  On November 19, 2010, the Department of Interior determined the Quapaw Analysis was complete and the Plaintiffs subsequently filed complaints relying heavily on the contents of the Quapaw Analysis.  Goodeagle, 111 Fed. Cl. at 720.

In the Quapaw Analysis, QIS identified a variety of examples of mismanagement of tribal trust funds.  Some instances identified in the Quapaw Analysis involved factual findings of lack of a determinate payment or specific unauthorized transactions with tribal

funds. Pls.' Mot. at 4. For example, the Government failed to pay yearly educational payments of $1,000 from 1932 until the present. Quapaw Tribe of Oklahoma, 123 Fed. Cl. 673, 676 (2015). Other instances of mismanagement claimed in the Quapaw Analysis involved damage calculations based on hypothetical or anticipated loss using models to value real property and minerals and extrapolation or calculation models to estimate the loss in income. E.g., Pls.' Mot. at 8-10. For example, QIS anticipated that it would cost $57,000 to return Catholic Mission Land Cemetery to trust status. Id. at 8.

On April 6, 2015, the Quapaw Tribe filed a motion for partial summary judgment citing the Quapaw Analysis as grounds. Quapaw, 123 Fed. Cl. at 673. In the Government's May 28, 2015 opposition to the Tribe's motion for partial summary judgment, the Government attempted to refute the factual findings of the Quapaw Analysis. Id. at 673, 678. On October 1, 2015, the court granted the motion for partial summary judgment on three claims. Id. at 678. First, this Court held that the Quapaw Tribe was entitled to $83,000 in unpaid educational payments pursuant an 1833 treaty with the Quapaw Tribe. Id. at 676. The Court based this decision on the factual finding of the Quapaw Analysis that no educational payments had been made between 1932 and 2015. Id. at 675. Second, this Court held that the Quapaw Tribe was entitled to $31,680.80 in unauthorized disbursements from its trust accounts. Id. at 677. The Court relied on the fact that the Quapaw Analysis identified and confirmed that the unauthorized disbursement occurred. Id. Third, this Court held that the Quapaw Tribe was entitled to the return of $70,330.71 in other unauthorized transactions. Id. at 678. Again, the Court based this decision on the factual finding of the Quapaw Analysis that transactions posted to the Tribal Trust Accounts could not be accounted for. Id.

Regarding the evidentiary role of the Quapaw Analysis, this Court made clear that the Government would not be permitted to refute the findings of the Quapaw Analysis. Id. Given the importance of whether the Quapaw Analysis is binding for the current cross-motions for partial summary judgment, the Court includes the exact language used in the October 1, 2015 decision.

> The Court also rejects the Government's attempt to take issue with the Quapaw Analysis …. Th[is] accounting endeavor[] [was] undertaken with the full support and cooperation of the United States. There comes a point when finality must be applied. If there are newly discovered documents that cause the Government to question the conclusions reached in the Quapaw Analysis …, the Government should have produced those documents earlier. The public's interest in ending decades-old disputes with

Native American Tribes outweighs the continued expenditure of time and resources to account for every last nickel. Allowing the Government to continue opposing the … Quapaw Analysis is contrary to the purpose and spirit of the legislation and settlement agreement that caused [it] to occur.

….

The Court will not permit Defendant to impeach this detailed report, when it could have produced documents or raised it concerns at a much earlier time. The Quapaw Analysis is binding upon the United States.

Id.

On June 27, 2016, the Plaintiffs filed another motion for partial summary judgment seeking judgment in their favor on the remaining claims determined in the Quapaw Analysis. Pls.' Mot. at 4. The Government filed its response in opposition on July 28, 2016 arguing that the Quapaw Analysis is not binding. Def.'s Resp. at 2. On August 15, 2016, the Plaintiffs filed their reply in support of their motion for partial summary judgment. The Government filed its cross-motion for partial summary judgment on July 15, 2016 claiming that the Plaintiffs were barred from recovery for many of their claims for various defects. In their August 15, 2016 response in opposition to the Government's motion for partial summary judgment, the Plaintiffs relied heavily on facts found in the Quapaw Analysis, once again putting the authority of the Quapaw Analysis at issue. On September 1, 2016, the Government filed its reply in support of its motion for partial summary judgment, again challenging the authority of the Quapaw Analysis.

## Discussion

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c). A fact is "material" if it might significantly alter the outcome of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing that there exists no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment will not be granted if the "evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court's function is not to weigh the evidence and determine the merits of the case presented, but to determine whether there is a genuine issue of material fact for trial. Id. at 249; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

A. The Quapaw Analysis

In breach of trust cases involving tribes, such as this one, the importance of a proper accounting cannot be overstated.  Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1345-48 (Fed. Cir. 2004).  Congress explicitly prohibits the statute of limitations from commencing to run until the tribe has been given an accounting. Pub. L. No. 112-74.  Without an accounting of trust management, a tribe is unable to determine whether any mismanagement has occurred.  The Quapaw Tribe waived their statutory right to this accounting in exchange for the QIS Contract which produced the Quapaw Analysis.  Settlement, art I, § 4.  This analysis is the primary basis upon which the Plaintiffs may build their breach of trust claim.  Thus, it is critical to clearly establish the legal effect of the Quapaw Analysis and ensure that the Quapaw Analysis serves the same function as the accounting which the Tribe waived.

Given the robust and pervasive disagreement about the legal effect of the Quapaw Analysis, the Court will address all points of contention between the parties and provide clear guidelines about which aspects of the Quapaw Analysis are binding for future matters in this case.  The Court holds that the factual findings of the Quapaw Analysis are binding upon the Government, but the valuation, extrapolation and calculation models of the Quapaw Analysis are not, prima facie, binding upon the Government.

1. The "law of the case" doctrine does not require an appellate decision

The law of the case is a judicially created doctrine aimed at preventing the relitigation of issues.  Jamesbury Corp v. Litton Indus. Prod., Inc., 839 F.2d 1544, 1550 (Fed. Cir.), cert. denied, 488 U.S. 828 (1988).  "The doctrine requires a court to follow the decision of a question made previously during the case."  Id.  This doctrine is strictly applied when an appellate decision has been made, and a trial court may not depart from appellate decisions on remand.  Id.; Exxon Corp. v. United States, 931 F.2d 874, 877 (Fed. Cir. 1991).  Law of the case should not be applied to previous trial court decisions except when to do so would be "inconsistent with substantial justice."  Hudson v. Principi, 260 F.3d 1357, 1363-64 (Fed. Cir. 2001).  There are times when a trial court may depart from its own prior decisions, however "[o]rderly and efficient case administration suggests that questions once decided not be subject to continued argument…"  Jamesbury, 839 F.2d at 1550.  Therefore, the law of the case doctrine should be applied to a trial court's own previous decisions in an effort to prevent redundant and continued argument, but not be applied when to do so would result in injustice.  Jamesbury, 839 F.2d at 1150; Hudson, 260 F.3d at 1364.

Relying on <u>Exxon</u> and <u>Hudson</u>, the Government claims that the October 1, 2015 decision cannot be law of the case because it has not been subject to appellate review. Def.'s Resp. at 12.  This argument is simply not true.  The Government suggests that because a trial court is not *strictly bound* by its previous decisions that it *cannot* treat its previous decisions as binding.  Even by the authority the Government cites, the law of the case doctrine *may* be applied to previous trial court decisions at the discretion of the court in the interest of avoiding relitigation.  Not only may a court treat its previous decisions as binding, but it is highly encouraged to do so barring extraordinary circumstances. <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. 800, 817 (1988).  The intuitive rule that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent states in the same case" supports a default application of the law of the case to a trial court's own previous decisions in a case.  <u>Id.</u> at 815-16.  "[C]ourts should be loathe to [revisit prior decisions] in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'"  <u>Id.</u> (citing <u>Arizona v. California</u>, 460 U.S 608, 618, n. 8 (1983)).  For example, in <u>Athey v. United States</u>, the court declined to treat its prior judgment as law of the case only after determining that it had erroneously interpreted the Back Pay Act.  123 Fed. Cl. 42, 52 (2015).

Therefore, not only is this Court permitted to treat its prior decisions as law of the case, it should do so unless it has identified some clear reasoning error in the prior decision.  It is worth noting that one function of applying law of the case to a trial court's own prior decision is to avoid lengthy, laborious re-evaluation of previously decided legal issues.  Here, the parties were forced to undergo exactly the redundancy which this doctrine was designed to avoid.

2. <u>Some part of the Quapaw Analysis is binding</u>

The October 1, 2015 decision did, in fact, make at least some part of the Quapaw Analysis binding upon the Government as clearly indicated by the plain language, "[t]he Quapaw Analysis is binding upon the United States." <u>Quapaw</u>, 123 Fed. Cl. at 678.  This Court addressed three reasons for this decision, all of which remain in force.

First, the Quapaw Analysis was undertaken with the "full support and cooperation" of the Government. <u>Id.</u>  The extent of the Government's involvement in the preparation of the Quapaw Analysis is described at length in the QIS Contract. <u>See</u> Contract, C.1.  At multiple points in the preparation of the Quapaw Analysis, the Government had the opportunity to evaluate the project by engaging in work sessions and discussions, reviewing the contents and methodology of the analysis, determining the sufficiency of criteria used in the analysis, limit the spending of QIS, and accept final delivery of the analysis. <u>Id.</u>  Despite all this, the Government denies any oversight of the analysis by

relying on language in the Contract stating that the Quapaw Analysis will not be deemed an accounting "endorsed" by the Interior.  Def.'s Resp. at 4 (citing Contract,. C.1 (b)).  This provision in the Contract, in which the Government attempts to evade responsibility for the Quapaw Analysis, is overcome by the sheer extent to which the Government did actually have some role in the preparation of the Quapaw Analysis.  The Government cannot now wash its hands of the Quapaw Analysis and claim that the analysis was not its "work product" simply because it was conducted by members of the Tribe under contract with the Government.  Contra Def's Resp. at 4-5.

Second, finality must be applied.  Quapaw, 123 Fed. Cl. at 678.  The various claims involved here originated over a century ago.  One goal of the Quapaw Analysis was to finally allow the Quapaw Tribe access to information in order to resolve century-old disputes.  In fact, completion of the QIS Contract was dependent upon Government determination that QIS had acquired enough information to complete the Quapaw Analysis.  "If OHTA determines…that additional information is not needed after its review of the Quapaw Analysis Methodology Briefing and the Document Collection Plan…the Contractor shall complete the Quapaw Analysis and this Contract shall be deemed fully complete."  Contract, C.1 (f) (1) (d).  The Government cannot prolong this process even further by continuing to uncover countless new sources of refuting evidence, especially when it previously determined that QIS had sufficient information to complete the Quapaw Analysis.  It is contrary to the interest of the parties, the interest of the public and spirit of the QIS Contract.

Third, and most importantly, the Quapaw *waived* their statutory right to an accounting in exchange for the QIS Contract.  Quapaw, 123 Fed. Cl. at 678.  As discussed above, an accounting of trust assets is a fundamental component of a tribe's ability to identify any mismanagement.  It is at odds with the spirit of the Consolidated Appropriations Act to allow the Quapaw Analysis to act as an accounting, yet not be binding in any way.  The Government claims the Quapaw Analysis is mere hearsay and not even admissible.  Def.'s Resp. at 17.  To agree would reduce the Quapaw Analysis to a meaningless document and make the terms of the Settlement nearly incomprehensible.  The Government's primary argument in response is that it did not intend to be bound by the Quapaw Analysis.  The Government relies heavily on a provision of the Settlement which states that by entering into the Settlement "Defendants do not waive any defenses they may have in response to claims that the Tribe may assert in the future."  Art. I, § 6.  Not only would this single sentence not be sufficient to overcome the considerations weighing in favor of finding the Quapaw Analysis binding, but the provision may be read consistently with finding the Quapaw Analysis binding.  The Government did not waive any future defenses by entering into the QIS Contract, but even a finding that it did waive future defenses does not require finding the work product of the Contract, called an "accounting" within the meaning of the Consolidated Appropriations Act, not binding on

the Government.  Settlement, Art. I, §4.  Further, the Contract language refers to the Government and the "Contractor" acknowledging that the Government does not limit its potential defenses to the conclusions reached by QIS.  Contract, C.1 (b).  But, the Quapaw Tribe itself was not a party to the Contract and so not bound by this acknowledgment.  Pls.' Reply at 5.

For the reasons previously addressed in the October 1, 2015 decision, the Quapaw Analysis remains binding on the Government.

<u>3. The Scope of the Quapaw Analysis' Binding Authority: Factual Findings</u>

This Court reasserts its prior holding that the Quapaw Analysis is binding on the Government, but now finds it necessary to clarify the scope of the Quapaw Analysis' binding authority.  According to the October 1, 2015 decision, the *factual findings* of the Quapaw Analysis are binding on the Government, but not the valuation, extrapolation and calculation models employed in the Quapaw Analysis to calculate damages.  Further, the Court now declines to hold that the results of models in the Quapaw Analysis are binding on the Government.

This Court granted the Plaintiffs' motion for summary judgment on the basis of factual findings of the Quapaw Analysis.  123 Fed. Cl. at 678.  Regarding the $83,000 in owed educational payments, this Court relied on the fact that the Quapaw Analysis "found no record that any educational payments required by the 1833 Treaty had been made from 1932 to the present."  Id. at 676.  Regarding the $31,680 in unauthorized disbursements from trust accounts, the Court relied on the fact that the Quapaw Analysis confirmed this amount in actual disbursements.  Id. at 677.  Lastly, the Court relied on the Quapaw Analysis' identification of unverified transactions posted to the trust accounts in awarding Plaintiffs $73,330.  Id. at 678.  In each instance, the Court relied on some factual finding in the Quapaw Analysis.  Further, in explaining its reasoning, the Court specifically disallowed the Government's introduction of new *documents* that challenged the accounting of particular funds and transactions.  Id.  The Government could not, and still cannot, challenge the Quapaw Analysis' findings regarding particular payments, transfers, rental collection, fund disbursement or other like transactions.

However, the Quapaw Analysis also alleges damages based upon more than factual determinations of lack of payment or unauthorized disbursement.  It contains valuation models of property and minerals, extrapolation models to calculate the estimated losses on many lots based upon actual losses on a few lots, and models to determine appropriate alternative rental and lease rates.  See Pls.' Mot. at 7-35.  There is substantial disagreement among the parties regarding whether these models accurately represent the Tribe's loss.  To illustrate just one such dispute, there is disagreement regarding whether certain land

could be suitably leased for agricultural crop land or grazing land, and what the value of those leases would be.  Def.'s Resp. Ex. 27-28;  Contra Pls.' Mot. at 8.  The Government's expert witnesses contend that the valuation model used in the Quapaw Analysis is unreliable and grossly inflates the potential value of the land.  Def.'s Resp. at 22.

A tribe's statutory right to an accounting is meant to provide it with a *historical* accounting in order to determine whether a loss has occurred.  Pub. L. No. 112-74; Shoshone, 364 F.3d at 1345-50.  The Consolidated Appropriations Act allows a tribe to gather information about losses to trust funds such as the collection of payments, depositing of money, and assessment of penalties.  Id. at 1350-51.  The accounting could entail a calculation of damages if the damages can be readily determined by evaluating the information found in these factual records.  Osage Tribe of Indians of Oklahoma v. United States, 68 Fed. Cl. 322, 335 (2005).  For example, in Osage the Court held that when the Government was required to list the highest posted price on leases to determine the appropriate royalty payments for all leases, the identification of the highest posted price could be used to calculate further damages because it was a necessary component of the accounting in the first place.  Id. (stating "This information was manifestly a part of the accounting required to be undertaken by the defendant as trustee.").  The statutory right to an accounting does not include a right to valuation, extrapolation and calculation models.  Unlike in Osage, the specific damage calculations in the Quapaw Analysis were not required in order to determine whether there was a loss to trust funds in the first place.

Thus, the considerations that led this Court to find the factual findings of the Quapaw Analysis binding in the October 1, 2015 decision are less convincing when applied to the analysis' valuation, extrapolation and calculation models.

First, the Quapaw Analysis was meant to provide the Quapaw Tribe with "'an accounting of [the Tribe's Tribal Trust Fund Accounts and any of its other trust assets] from which the [Tribe] can determine whether there has been a loss' within the meaning of Pub. L. No. 108-7 (2003), and the similar statutes passed each year since 1990." Settlement, Art. I, §4.  The Consolidated Appropriations Act is meant to provide the tribe with a historical accounting to determine whether there had been mismanagement of their trust funds.  Shoshone, 364 F.3d at 1350; Osage, 68 Fed. Cl. at 335.  Whether there has been mismanagement is a factual determination.  In the October 1, 2015 decision, this Court emphasized that the Government was bound by the findings in the Quapaw Analysis because to hold otherwise is "contrary to the purpose and spirit of the legislation and settlement agreement."  Quapaw, 123 Fed. Cl. at 678.  However, it is not contrary to the purpose of the legislation and settlement agreement to allow the parties to present evidence regarding the proper valuation, extrapolation and calculation models.  The Court's interest in ensuring that the Quapaw Tribe not give up their statutory right for something less than that right is not at issue.

Second, the interest in finality is satisfied by holding only the factual findings binding. The factual findings in the Quapaw Analysis may be used to establish that there was mismanagement of trust funds which aids significantly in the resolution of this case.

Finally, the QIS Contract suggests that the Government had less oversight of the models used to calculate damage than it did over the collection of documents and determinations of fact. See Contract, C.1 (f). During Phase I, the Government had to make a determination that sufficient information was collected by QIS in order to move forward with the Analysis. Id. at C.1 (f) (1) (d). The Government would assess whether more information was needed to complete the analysis, which is a factual determination. Id. After this determination, the Quapaw Analysis was completed by QIS. Id. Thus, while the Government had clear and explicit opportunity to review the factual findings of the Quapaw Analysis, it is less clear that it had the same opportunity to review the valuation, extrapolation and calculation models. Whether the Government did actually review those models used in the Quapaw Analysis could be further addressed at trial.

For these reasons, this Court holds that only the factual findings of the Quapaw Analysis will be binding on the Government. The Government will not be permitted to dispute the factual findings of the Quapaw Analysis, but may present evidence challenging the valuation, extrapolation or calculation models used in the Quapaw Analysis to calculate damage based upon those factual findings.

4. Expert Testimony Regarding the Quapaw Analysis

Moving forward in the resolution of this case, it is worth clarifying what kind of expert testimony the Government may introduce to challenge the Quapaw Analysis. The Government may not introduce expert testimony to impeach the factual record of the Quapaw Analysis, as the factual record may not be challenged by experts generally. Brooke Group Ltd. V. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). However, the Government may introduce expert testimony to dispute the valuation, extrapolation and calculation models employed in the Quapaw Analysis. The Quapaw Tribe argues that the Government should not be able to introduce any evidence attacking the Quapaw Analysis. The Tribe argues that it "[does] not have the resources to prepare another accounting analyzing the documents produced for the first time in discovery in this litigation." Pls.' Reply at 12. The Court agrees that the Quapaw Tribe should not have to prepare another accounting, but does not agree that responding to the Government's challenges regarding the models used in the Quapaw Analysis would require it to do so. As noted above, there is less evidence of Government oversight regarding the models used to calculate damages. The Government convincingly argues that if it cannot challenge the models used, then the "United States handed a blank check to the QIS Team [and]…delegated to the Tribe the absolute right to unilaterally dictate the amount of money

the United States owes to the Tribe." Def.'s Resp. at 6.  For these reasons, the Government may challenge the valuation, extrapolation and calculation models used to calculate damages at trial.

B. Individual Claims in the Cross Motions for Summary Judgment

The parties assert that many claims in this case are ripe for summary judgment.  The Quapaw Tribe rests its motion for partial summary judgment on the binding authority of the Quapaw Analysis.  After finding that the valuation, extrapolation and calculation models are not binding on the Government, the Tribe's motion for partial summary judgment is DENIED.  The Government presents a litany of arguments attempting to show that many of the Plaintiffs' claims are barred, seeking summary judgment.  None of these arguments are valid and, thus, the Government's motion for partial summary judgment is likewise DENIED.  The Court will address the issues involved in the cross-motions for partial summary judgment in turn.

1. The Quapaw Tribe's Motion for Partial Summary Judgment

The Quapaw Tribe moves for partial summary judgment on "the remaining claims determined in the Quapaw Analysis."  Pls.' Mot. at 3.  It relies on the October 1, 2015 decision as grounds for claiming that the entirety of the Quapaw Analysis is binding.  If the Quapaw Analysis is binding in its entirety, then there would be no dispute of fact and summary judgment would be proper.  RCFC 56(c).  However, as discussed above, the Government is not bound by the valuation, extrapolation or calculation models used in the Quapaw Analysis.  Of the claims for which the Quapaw Tribe is seeking partial summary judgement, most of them explicitly refer to the use of one of these models.  See Pls.' Mot. at 8-10, 23-25, 27, 30-38.  Extrapolation models were used to determine the total chat income loss.  Id. at 38.  Valuation models for rental rates were used to determine town lot rental losses.  Id. at 31-36.  A "rental enterprise model" was used to compute the lost agricultural leasing income.  Id. at 30.  A "sophisticated production model" was used to determine losses associated with Industrial Park.  Id. at 26.  A calculation and valuation model was used to determine the anticipated cost of returning the Catholic Mission Land Cemetery to the Tribe.  Id. at 23.  The Government challenges the validity of all of these models, thus asserting genuine disputes of fact.  Def.'s Resp. at 16-39.

The use of modeling to compute the damages for these claims is generally pervasive.  So much so, that this Court cannot grant partial summary judgment on any of the claims due to the extensive factual disagreements surrounding these claims.  The parties must be given the opportunity to present evidence regarding the models, either expert testimony regarding the validity of the models themselves or testimony regarding the Government's oversight or approval of the models used in the Quapaw Analysis.

12

2. Establishing a Money-Mandating Duty in *Quapaw* and *Goodeagle*

The Government claims that it is entitled to partial summary judgment in its favor regarding all the claims brought by the Quapaw Tribe and Goodeagle because "plaintiffs have failed to identify a money-mandating duty for *any* of their claims" required to invoke jurisdiction in this Court. Def.'s Mot. at 8 (Goodeagle) (emphasis added). To establish jurisdiction under the Indian Tucker Act, a tribe must "identify a substantive source of law that establishes a specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." United States v. Navajo Nation, 556 U.S. 287, 290 (2009). If that threshold is met, the tribe must then show that the relevant source of law can be fairly interpreted as requiring payment of money damages for breach of that duty. Id. at 290-91. The Government claims that Goodeagle has failed to identify any substantive law that establishes a specific duty. Def.'s Mot. at 9 (Goodeagle). The Government also claims that the Quapaw Tribe has failed to identify a substantive law that establishes a specific duty to ground its claim of loss of tribal sovereignty. Def.'s Mot. at 5 (Quapaw).

The Quapaw Tribe and Goodeagle successfully respond by referring to the "extensive network of federal statutes and regulations" that concern the Government's fiduciary duties to tribes, which the Plaintiffs assert were discussed in the Quapaw Analysis. Pl.'s Resp. at 8 (Quapaw). The citation list is extensive. In support of its claim regarding losses on the Catholic Forty, Goodeagle cites 25 U.S.C. §§ 397, 402, & 3715 and 25 C.F.R. § 171. To support its claim regarding losses on agricultural leases, Goodeagle cites 25 C.F.R. § 171. In support of its claim regarding losses on town lot leases, Goodeagle cites 25 C.F.R. §§ 131, 162, & 171; 25 U.S.C. 2218, and Rules and Regulations Governing the Department of the Interior in its Various Branches, part 4 (February 26, 1907). In support of its claim of loss of tribal sovereignty, the Quapaw Tribe cites the Indian Land Consolidation Act and 25 U.S.C. 2205, 2209, & 2216. The list continues. Pl.'s Resp. at 10-40 (Goodeagle); Pl.'s Resp. at 8-18 (Quapaw). More citations to substantive law can be found in the Quapaw Analysis itself. See Quapaw Analysis at 134-55 (2010) (Quapaw Tribe, Dock. No. 14-1).

The Government attempts to refute many of the Plaintiffs' citations by arguing that certain statutes referred to, such as the Indian Mineral Leasing Act and the Consolidated Resolution Act of 2010, cannot be fairly interpreted as money-mandating or suffer some other defect. Def.'s Reply at 3-6 (Quapaw); Def.'s Reply at 13-16 (Goodeagle). However, summary judgement should not be granted if a reasonable trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248. Given the array of citations to substantive law plausibly grounding a money-mandating duty and the Government's failure to address each citation, the Government has not met its burden of showing that there is not a single genuine dispute of fact.

### 3. Establishing a Duty in *Bear*

The Government also argues that Bear has failed to identify a duty breached by the Government concerning the Catholic Forty or unleased lots. Def.'s Mot. at 3 (Bear). For a congressional reference case, such as Bear, the plaintiff must show that the Government breached a duty and there exists no enforceable legal remedy. Menominee Indian Tribe of Wisconsin v. United States, 39 Fed. Cl. 441, 457-58 (1997); White Sands Ranchers of New Mexico v. United States, 14 Cl. Ct. 559, 565 (1988). The Government claims that it owes no duty to the Tribe to ensure it receives mineral royalties from the Catholic Forty since the Catholic Church was the fee simple owner of the land. Def.'s Mot. at 4 (Bear). Bear responds that the Government breached its duty in transferring the land to the Catholic Church in the first place and further breached its duty by not ensuring the land reverted back to the Tribe once it was no longer used as a school. Pl.'s Resp. at 5, 9 (Bear). The Government also claims that it had no duty to ensure that all the town lots and agricultural lands are leased. Def.'s Mot. at 6 (Bear). Bear responds that its claims are based upon breach of the Government's duty of care to secure adequate leases and collect rents on leased lands. Pl.'s Resp. at 10-18 (Bear). Bear further asserts that the Government sets up a "straw man" by falsely characterizing Bear's claims as a demand for the Government to lease all lands. Id. at 19.

Setting aside the Government's uncharitable representation of the Plaintiff's claims, the parties' filings expose substantial disputes of facts regarding whether the Government had a duty of care which it breached. First, the parties disagree about whether the Government had the authority to transfer land without the Tribe's authority. Def.'s Reply at 5 (Bear); contra Pl.'s Resp. at 6 (Bear). Second, the parties disagree about whether the land transfer to the Catholic Church was a fee simple or a reversionary transfer of land so long as the land was used for a school. Def.'s Reply at 6 (Bear); contra Pl.'s Resp. at 6 (Bear). There are factual disagreements about whether the town lots and agricultural lands were inadequately leased based on the valuation models used in the Quapaw Analysis. Def.'s Reply at 9 (Bear); contra Pl.'s Resp. at 10, 16 (Bear). These factual disagreements affect the question of the Government's duty. Therefore, summary judgment is not appropriate.

### 4. CERCLA's effect on recovery in *Bear*

For a congressional reference case to succeed, there cannot exist an alternative adequate legal remedy for the loss claimed. White Sands, 14 Cl. Ct. at 565. The Government argues that Bear's claim for natural resources damages is not ripe because the Comprehensive Environmental Response Cleanup and Liability Act ("CERCLA") is an adequate legal remedy. Def.'s Mot. at 7 (Bear) (citing 42 U.S.C. § 9601). The Government suggests that Plaintiffs may not bring a claim against the Government until

the clean-up efforts on the site are complete.  It cites a Ninth Circuit case as support stating that until the cleanup is complete damages cannot be measured.  Def.'s Mot. at 7 (Bear) (citing Alaska Sport and Fishing Ass'n v. Exxon Corp., 34 F.3d 769,772 (9th Cir. 1994)).  It further argues that any relief this Court could offer would be duplicative as CERCLA provides recovery for all losses associated with the damage.  Def.'s Reply at 2 (Bear) (citing H.R. REP No. 99-253, pt. 4, at 50 (1985) ("[T]he total amount of damages may include…the value of all the lost use of the damaged resources…").

This argument fails for several reasons.  First, this Court agrees with Bear that CERCLA is in no way an *adequate* legal remedy.  After beginning in 1984, cleanup is estimated to be complete in approximately 2040.  Pl.'s Resp. at 25 (Bear), Ex. 2, Meyer Dep. at 20.  The Tribe has experienced, and will continue to experience, measurable loss while cleanup is underway.  Second, CERCLA provides remedy for damage to, or loss of, natural resources, and the costs of "damage assessment or restoration, rehabilitation, or acquisition for the same release and natural resource." 42 U.S.C. § 9607 (f) (1).  Contrary to what the Government claims, damages are only recoverable under CERCLA for interim loss of use of the resource, not all loss.  Id.; New Mexico v. General Elec. Co., 467 F.3d 1223, 1244 (10th Cir. 2006) (damages are recoverable for "interim loss of *use*.") (emphasis added).  Many of Bear's claims go beyond the loss of use of natural resources, such as the loss of rents, diminution of land value, and loss of traditional hunting practices.  Pl.'s Resp. at 26 (Bear).  The question of whether these kinds of losses are recoverable during CERCLA cleanup efforts cannot be resolved via summary judgment.  Finally, this Court has already ruled that the Tribe's breach of trust claims are not pre-empted by CERCLA.  "Plaintiffs' claim rests on the Government's breaches of duties and obligations that made the EPA cleanup necessary. Accordingly, Plaintiffs' fifth cause of action is not preempted by CERCLA."  Goodeagle, 111 Fed. Cl. at (2013).

Thus, the Government is not entitled to summary judgment on Bear's claim for natural resources damages.

### 5. Statute of Limitations in *Quapaw* and *Goodeagle*

The statute of limitations does not commence to run on any tribal breach of trust claim until the tribe has been furnished with an accounting.  Pub. L. No. 112-74.  The Federal Circuit has limited the tolling of the statute of limitations to claims of mismanagement after funds were actually collected and to losses to trust resulting from the Government's failure to timely collect amounts owed.  Shoshone, 364 Fed. Cir. at 1350.  Notice of a breach of trust cannot be achieved without a final accounting, and thus claims that depend on identifying failures to appropriately collect amounts owed based on actual leases should be tolled until a final accounting is completed and furnished to the tribe.  Id. at 1348.

On July 16, 2013, this Court dismissed the claims by the Quapaw Tribe and Goodeagle which were not grounded in actual leases. Quapaw, 111 Fed. Cl. at 733; Goodeagle, 111 Fed. Cl. at 722. This Court held that Plaintiffs' claims were "timely as to allegations relating to actual leases, but not timely as to hypothetical leases" because an accounting would not shed light on hypothetical, nonexistent leases. Id. The reasoning of the Court was similar to that in Shoshone. The final accounting is not necessary to put the Quapaw Tribe on notice regarding claims of entirely hypothetical leases. As a result, claims regarding hypothetical leases, or suboptimal leases, were moved to the Congressional Reference case, Bear. Pl.'s Resp. at 21 (Quapaw).

The Government now asserts that all of the Quapaw Tribe and Goodeagle's claims relating to undercollection on leases are not timely because they are based only on hypothetical leases. Def.'s Mot at 4-5 (Goodeagle); Def.'s Mot. at 6 (Quapaw). The Plaintiffs contend that the Government has simply ignored the repeated references to actual leases. Pl.'s Resp. at 19 (Goodeagle). The Quapaw Tribe argues that the undercollection on leases claims that remain a part of Goodeagle and Quapaw are based upon actual leases. Id.; Pl.'s Resp. at 21 (Quapaw). The Quapaw Tribe lists various leases upon which its claims are based and refers to many locations in the Quapaw Analysis which also refer to actual leases. Pl.'s Resp. at 11-16, 19-25, 31-33, 37 (Goodeagle); Pl.'s Resp. at 21 (Quapaw). Given that whether a claim is based upon actual leases is a vital determination, there is clearly a relevant dispute of fact. The Quapaw Tribe has done enough to cast doubt upon the Government's assertion that *none* of the Plaintiffs' claims are based on actual leases.

The Government also relies heavily on the fact that the Quapaw Analysis determines losses on leases not investigated by QIS by extrapolating the life-cycles of a few leases. Def.'s Mot. at 6-9 (Quapaw). It claims that the Quapaw Tribe cannot "extrapolate from actual leases in two lease-cycles to all leases for all lease-cycles…Extrapolation lands Plaintiff squarely within the Shoshone bar." Def.'s Reply at 9-10 (Quapaw). The Court is not convinced. The extrapolations made during the Quapaw Analysis were to actual, albeit unknown, leases. Shoshone bars the tolling of time for hypothetical, non-existent leases, but there is a difference between hypothetical, non-existent leases and actual, unknown leases. The Government is correct that this Court will not grant summary judgment in the Tribe's favor on behalf of these extrapolations, but it will also not find them untimely. The Government's argument is especially unconvincing given that the reason why the extrapolation was necessary was because the Government limited QIS's access to actual leases. Pl.'s Reply at 22 (Quapaw). "Multiple requests were made to several [Department of Interior] entities prior to the conclusion of the last delivery for particular documents…The Project Team received no response to certain of these requests…" Quapaw Analysis at 3-4. The Government cannot now try to bar the Tribe's claims due to the extrapolation after causing the need for the extrapolation in the first place.

Thus, the Government is not entitled to summary judgment on the basis of the statute of limitations.

### 6. Res Judicata in *Goodeagle*

In another attempt to bar Goodeagle's claims, the Government asserts that the doctrine of res judicata prevents Goodeagle from claiming damages for royalty undercollection for lead, zinc, and other minerals between 1922 and 1966. Def.'s Mot. at 13 (Goodeagle). The doctrine of res judicata entails that a second suit will be barred if there exists a prior suit in which "(1) there is identity of parties (or their privies); (2) there has been an earlier final judgment of the merits of the claim; and (3) the second claim is based on the same set of transactional facts as the first." Jet, Inc. v. Sewage Aeration Sys., 222 F.3d 1360, 1362 (Fed. Cir. 2000). According to well-established principles of res judicata, the first element requires that the parties' interests be adverse. Penda Corp. v. United States, 44 F.3d 967, 972 (Fed. Cir. 1994); Restatement (Second) of Judgments § 38 (1982). The purpose of this requirement is to ensure that the parties had the opportunity to present evidence regarding specific issues in response to another. Id. at cmt. a.

In 1937, Goodeagle's predecessors filed suit against mining companies for failure to pay mineral royalties. Whitebird v. Eagle Picher Co., 258 F.Supp. 308 (N.D. Okla. 1966). The Government intervened "on behalf of itself and the individual members of the Quapaw Tribe." Def.'s Mot. at 12 (Goodeagle). The suit resulted in a stipulation resolving the claims. Id. While the Court has reservations about whether most of the elements of res judicata apply here, that the parties were not adverse in the previous litigation is the most serious defect. The Government intervened on behalf of Goodeagle's predecessors and, thus, were not adversaries. The Government cannot point to any particular issue where the Government and Goodeagle's predecessors were at odds in the prior litigation. The Government claims that parties need not be direct adversaries so long as there is a "close or significant relationship between successive defendants" even if previously on the same side of a litigation. Def.'s Reply at 2 (Goodeagle) (citing Gambocz v. Yelencsics, 468 F.2d 837, 841 (3rd Cir. 1972). The Restatement of Judgements sheds light on what kind of relationship would suffice, "[t]his relation arises between defendants who are parties to a cross-claim, between a defendant and an impleaded third-party defendant, and between parties who have been interpleaded." Restatement (Second) of Judgments § 38, cmt. a. The Government was simply not in a similar relationship to Goodeagle's predecessors during the 1937 litigation, and surely not in an adverse relationship.

Thus, the Government is not entitled to summary judgment in its favor regarding Goodeagle's undercollection of mineral royalties claim based on Res Judicata.

7. Educational Payments in *Quapaw*

Finally, the Government seeks summary judgment in its favor on the educational payments because the Indian Claims Commission Act ("ICCA") requires bringing treaty claims existing prior to 1946 within 5 years. Def.'s Mot. at 2-3 (Quapaw) (citing Indian Claims Commission Act, Pub. L. No. 79-726, 60 Stat. 1049 (1946)). The Quapaw Tribe correctly points out that this exact issue was already decided by this Court in the October 1, 2015 decision in favor of the Tribe. Pl.'s Resp. at 6 (Quapaw); Quapaw, 123 Fed. Cl. at 678. This Court held that the Quapaw Tribe's claim regarding educational payments was preserved until an accounting was completed in 2010. Quapaw, 123 Fed. Cl. at 677. In the Government's Reply, it stated that it "does not seek to re-litigate the bases for summary judgment on the education payments this Court has already rejected." Def.'s Reply at 9 (Quapaw). The Court will not rehash old arguments. Not only is the Government not entitled to summary judgment regarding the educational payments, this Court already granted summary judgment in favor of the Tribe nearly a year ago.

Conclusion

The case involves a complex and lengthy history of facts. In particular, the validity of the models used in the Quapaw Analysis is at the heart of many of the disputes between the Quapaw Tribe and the Government. The Court will GRANT IN PART Plaintiffs' motion as to the factual findings in the Quapaw Analysis, but in all other respects, Plaintiffs' motion is DENIED. The Government's motion for partial summary judgment is also DENIED. Although the Government asserts many varied grounds for summary judgment, some of which border on being frivolous, none of them demonstrates the lack of material fact dispute needed for summary judgment.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

18